**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| DAVID CARDONA,<br><br>                    Plaintiff,<br><br>v.<br><br>MARK A. FERGUSON,<br>ELIAS VEGA, and<br>DAMON P. DREY,<br><br>                    Defendants. | Case No. 4:22-cv-00412<br><br>JURY DEMAND |

**COMPLAINT AND DEMAND FOR JURY TRIAL**

## NATURE OF THE CASE

1.      This is a civil rights case about three Pasadena Police Department officers who framed a man for a felony he did not commit.

2.      Defendant Officers Mark A. Ferguson, Elias Vega, and Damon P. Drey lied in two sworn affidavits, submitted to two different courts. They lied in police reports to corroborate the affidavits. And they lied to the Harris County District Attorney's Office to justify the wrongful arrest, jailing, and prosecution of David Cardona.

3.      Based on Defendants' lies, a judge granted their request for a warrant to forcibly extract and examine Mr. Cardona's blood.[1] The District Attorney's Office charged and prosecuted Mr. Cardona for a felony. A magistrate found probable cause for the prosecution to continue. And,

---

[1] The toxicological analysis would later report that Mr. Cardona's blood alcohol content was beneath the legal limit.

until four months later when the case was finally dismissed, Mr. Cardona had his life upended by the trauma and daily deprivations of liberty inflicted by a pending felony prosecution.

4.      On the night of Mr. Cardona's arrest, officers stopped him for a traffic infraction. Mr. Cardona agreed to complete a full battery of Standardized Field Sobriety Tests (SFSTs) administered by Defendant Vega. Mr. Cardona successfully completed them without exhibiting evidence of intoxication or impairment. Defendant Vega discussed Mr. Cardona's successful completion of the tests with Defendants Ferguson and Drey, concluding, "he's good," "he had good balance and stuff like that," and even "I had worse balance [than Mr. Cardona did] on the One Leg Stand." Defendant Vega noted that Mr. Cardona only had two "clues" on the most reliable field sobriety test—half the minimum number to allow an inference of intoxication. Defendants prepared to release Mr. Cardona. Defendant Vega returned Mr. Cardona's driver's license to the officer who originally collected it. Defendant Ferguson told Mr. Cardona that he would be going home.

5.      But as Defendant Vega was across the road, explaining his conclusion to Defendant Drey, Defendant Ferguson, who until that point had not participated in the investigation, suddenly began pressuring Mr. Cardona to take a voluntary Preliminary Breath Test. Defendant Ferguson said the test would just be to help assess the job performance of Defendant Vega.

6.      Following the administration of an SFST battery that led the investigating officer, here Defendant Vega, to conclude the subject was not intoxicated or impaired, a Preliminary Breath Test would serve no purpose. Preliminary Breath Tests "d[o] not indicate the level of the

2

subject's impairment."[2] Rather, by detecting the presence of alcohol, they can only help identify the chemical source of an already-observed impairment.[3]

7.     After Mr. Cardona questioned the legitimacy of Defendant Ferguson's request, Defendant Ferguson became aggravated. He spontaneously directed Defendant Vega to just "take him to jail." Mr. Cardona, still questioning the basis of Defendant Ferguson's request as well as the abrupt demand that Defendant Vega arrest him, asked whether he could make a phone call. Defendant Ferguson again directed Defendant Vega to "take him to jail." Defendant Vega complied and placed Mr. Cardona under arrest for Driving While Intoxicated. Before leaving the scene, the three Defendants briefly huddled together out of earshot from any other witnesses. The Pasadena Police Department Records Section confirmed it does not have any recordings of that conversation.

8.     At least Defendants Ferguson and Vega were later present together at the station during and after Mr. Cardona's booking, before they or Defendant Drey produced any affidavits or reports.

9.     The three officers then took steps to conceal and justify Defendant Ferguson's unilateral and unjustified decision to arrest Mr. Cardona, as well as to further retaliate against Mr. Cardona. Defendants agreed to submit, through Defendant Vega, a sworn application for a blood extraction warrant to a judge.[4] But rather than accurately recount Mr. Cardona's performance on the field sobriety tests, the sworn affidavit hinged on multiple false statements that were directly contradicted by Defendants' own statements to one another on the scene. It also omitted numerous

---

[2] Nat'l Highway Traffic Safety Administration (NHTSA), *Instructor Guide: DWI Detection and Standardized Field Sobriety Testing (SFST)* 319 (2018), https://www.nhtsa.gov/sites/nhtsa.gov/files/documents/sfst_full_instructor_manual_2018.pdf (emphasis in original).
[3] *Id.*
[4] *See* Affidavit for Search Warrant at 2 (attached as Exhibit 1).

exculpatory facts that Defendants knew were true and material. Defendants repeated those lies and omissions, again through Defendant Vega, to the screening prosecutor at the Harris County District Attorney's Office to convince the office to accept and prosecute the wrongful charge. Defendants then submitted yet another falsehood-ridden affidavit to a magistrate for a determination of probable cause, once again with Defendant Vega's signature. It contained the same falsehoods and omissions as the first, leading the magistrate to both find probable cause that Mr. Cardona committed a felony and impose several burdensome conditions on him.

10. By fabricating evidence in the form of false affidavits, reports, and other statements, and deliberately misleading a judge, magistrate, and a prosecutor, Defendants subjected Mr. Cardona to a humiliating and traumatic arrest in front of his partner; an involuntary and illegal blood extraction and examination by a government agent; two nights in jail instead of his own bed; days of lost work and income; onerous drug and alcohol testing requirements; and a multitude of other harms inflicted by a felony case that hung over Mr. Cardona's head for four months.

11. While the criminal case against him was still pending, Mr. Cardona filed a formal disciplinary complaint with Pasadena Police Department's Internal Affairs Division.

12. The next day, the District Attorney's Office dismissed the case against him.

13. Mr. Cardona later received a letter signed by the Chief of the Pasadena Police Department and a representative of the Internal Affairs Division.

14. The letter stated that the department had conducted a formal investigation.

15. It concluded, "The evidence assembled during the investigation was sufficient to prove the allegation made in your complaint . . . ."

16. Mr. Cardona now brings this action under 42 U.S.C. § 1983 to seek redress for Defendants' violation of his constitutional rights.

## PARTIES

17.     Plaintiff David Cardona is a twenty-seven-year-old man. He works full-time as an electrician for a contracting company at a chemical plant and refinery in Baytown, Texas. He has worked at the chemical plant and refinery since April 2018. He is a resident of the State of Texas.

18.     Defendant Mark Alan Ferguson is a senior officer in the Pasadena Police Department (PPD) Driving While Intoxicated Task Force. He has worked as an officer at PPD since 1996. He is a resident of the State of Texas. He is sued in his individual capacity.

19.     Defendant Elias Vega is an officer in the PPD Driving While Intoxicated Task Force. He joined PPD in 2019 and has worked as an officer for more than eight years. He is a resident of the State of Texas. He is sued in his individual capacity.

20.     Defendant Damon Drey is a patrol officer with PPD. He has worked as an officer at PPD since 1998. He is a resident of the State of Texas. He is sued in his individual capacity.

## JURISDICTION AND VENUE

21.     Mr. Cardona brings this action under the First, Fourth, and Fourteenth Amendments to the United States Constitution, as authorized by 42 U.S.C. § 1983.

22.     The Court has jurisdiction over Mr. Cardona's claims under 28 U.S.C. §§ 1331 (action arising under the Constitution and federal law) and 1343(a) (action to redress deprivation of civil rights).

23.     Venue is proper under 28 U.S.C. § 1391(b) because one or more Defendants reside in this judicial district and all Defendants are residents of Texas, or, alternatively, because a substantial part of the events or omissions giving rise to Mr. Cardona's claims occurred in this district.

## STATEMENT OF FACTS

**I.    Mr. Cardona Successfully Completed the Standardized Field Sobriety Tests.**

24.    On February 9, 2020, at approximately 1:00 AM, Mr. Cardona was driving his partner home from a date. Mr. Cardona's partner was riding in the passenger seat.

25.    Since 2018, Mr. Cardona has worked long, ten-to-twelve-hour shifts at a chemical plant and refinery. His job is so demanding that he often just comes home and collapses into bed. Yet that night, after working all day, he and his partner wanted to enjoy a relaxing evening out together.

26.    As they were driving near the 500 block of Pasadena Boulevard in Pasadena, Texas, Defendant Damon Drey, a police officer with the Pasadena Police Department, pulled over Mr. Cardona for a traffic infraction.

27.    At the time Defendant Drey stopped Mr. Cardona, Mr. Cardona was not intoxicated or impaired.

28.    Still, Mr. Cardona and his partner, who are both Hispanic, had good reason to feel nervous.

29.    The Pasadena Police Department (PPD) has long-established ties to the Ku Klux Klan and a documented history of discrimination against Hispanic people.

30.    In a 2017 opinion, Chief Judge Lee H. Rosenthal of the U.S. District Court for the Southern District of Texas made the following factual findings:

> a.   Throughout the 1990s, "there were continuing incidents of police mistreatment of Latinos and complaints about a close relationship between the Pasadena Police Department and the Ku Klux Klan."[5]

---

[5] *See Patino v. City of Pasadena*, 230 F. Supp. 3d 667, 684-85 (S.D. Tex. 2017) (noting, "Pasadena was the Texas headquarters of the Ku Klux Klan" and "[t]he Klan targeted Mexican-Americans").

b. "Complaints of police antipathy toward Latino residents have continued to the present."[6]

c. "In the past several years, Latino residents in North Pasadena have repeatedly complained to Council members that they are more likely to be targeted for traffic stops by police than Anglo residents."[7]

d. "Pasadena officials from the 1990s to the present have engaged or permitted discriminatory conduct in law enforcement, including Mayor Isbell's direction [in 2008] to police to automatically impound cars driven by Latinos without proof of insurance but use their discretion when the driver is Anglo."[8]

31.     Approximately one year before that evening, PPD's first Hispanic police chief had resigned amidst allegations that he had been forced out.[9] He had occupied the position for less than two years.

32.     Nonetheless, Mr. Cardona hoped that if he cooperated with the police, they would treat him fairly and honestly.

33.     Defendant Drey has been employed by PPD since 1998. He is white.

34.     Defendant Mark Ferguson, who would arrive later and instigate the misconduct at issue in this case, has been employed by PPD since 1996. He is also white.

35.     Defendant Drey asked Mr. Cardona to step out of his car. Mr. Cardona complied.

36.     Defendant Drey asked Mr. Cardona for his license, which Mr. Cardona provided.

37.     Defendant Drey asked Mr. Cardona several questions, which Mr. Cardona answered in a normal and sober manner of speaking.

38.     Mr. Cardona did not slur his words.

39.     His eyes were clear.

---

[6] *Id.* at 685.
[7] *Id.*
[8] *Id.* at 714.
[9] Jaimy Jones, *Pasadena's First Hispanic Police Chief Retires Amid Questions*, HOUS. CHRON. (Nov. 7, 2018), https://www.chron.com/neighborhood/pasadena/news/article/Pasadena-s-first-Hispanic-police-chief-retires-13372748.php.

40.    He did not emit a strong odor of alcohol.

41.    In response to questions by Defendant Drey, Mr. Cardona stated that he had consumed two beers at a bar, a couple of hours earlier. Defendant Drey radioed for a Driving While Intoxicated (DWI) Task Force unit.

42.    Mr. Cardona remained standing outside of his car while waiting for the DWI Task Force unit to arrive, as instructed by Defendant Drey.

43.    During the approximately 11 minutes and 30 seconds that Defendant Drey required Mr. Cardona to stand outside of his car, Mr. Cardona did not sway from side to side or appear unbalanced. On the contrary, Mr. Cardona remained steady on his feet and followed Defendant Drey's instructions.

44.    Meanwhile, Mr. Cardona's partner waited in the car. She was anxious, but still believed that the officers would realize that Mr. Cardona was not intoxicated and release him.

45.    Eventually, a DWI Task Force unit arrived. It consisted of Defendant Mark Ferguson and his junior partner, Defendant Elias Vega. Defendant Vega is an officer in the DWI Task Force who has worked at PPD since 2019.

46.    Defendant Ferguson, like Defendant Drey, has been an officer at PPD from the 1990s to the present, the period during which Chief Judge Rosenthal found there were "continuing incidents of police mistreatment of Latinos and complaints about a close relationship between the Pasadena Police Department and the Ku Klux Klan."[10]

47.    Defendant Ferguson has publicly shared a number of social media posts suggesting animus toward people of color, immigrants, those with low income, and those who lawfully critique the police. For instance, on June 27, 2018, he publicly re-shared a post that Facebook

---

[10] *Patino*, 230 F. Supp. 3d at 684-85.

tagged as "False information." Among other things, it favorably described how other countries punish undocumented immigrants with "hard labor," being "detained indefinitely," "shot," "never heard from again," "thrown into political prison to rot," and death, while observing that, in contrast:



48.    In another example, tagged by Facebook as "Partly false information," Defendant Ferguson publicly re-shared a social media post with a picture of a letter to the editor glorifying Confederate soldiers and a comment calling for the prosecution of those who "desecrate" Confederate graves and monuments:



49.     Upon arriving at the location where Defendant Drey had stopped Mr. Cardona, both Defendant Ferguson and Defendant Vega exited their squad car.

50.     Defendant Vega took the lead in evaluating Mr. Cardona and conducting the investigation. Defendant Drey handed Defendant Vega Mr. Cardona's license.

51.     Over the next ten minutes, Defendant Vega asked Mr. Cardona to answer a series of questions and perform a variety of Standardized Field Sobriety Tests (SFSTs).

52.     Mr. Cardona answered the questions and consented to performing the SFSTs.

53.     The tests included: (1) a "Horizontal Gaze Nystagmus" (HGN) test, in which Mr. Cardona was instructed to follow a pen with his eyes without moving his head; (2)  a "Walk and Turn" test, in which he was instructed to take a series of steps while counting aloud, turn around, and walk back to where he started; and (3) a "One Leg Stand" test, in which he was instructed to balance on one foot while counting aloud.

54.     On each test, Defendant Vega watched to see how many "clues" Mr. Cardona exhibited. Clues are behavioral indicators which, when present in sufficient number–called a "decision point"–on a particular test, may permit an inference of intoxication or impairment when considered in the totality of circumstances.[11]

55.     Mr. Cardona successfully completed the field sobriety tests: he followed Defendant Vega's instructions, stood steadily on his feet, and maintained control of his body throughout them.

56.     Mr. Cardona did not slur his speech.

57.     After concluding the tests, Defendant Vega directed Mr. Cardona to "hang tight for me" while he walked over to speak with Defendant Ferguson.

58.     After debriefing Defendant Ferguson, Defendant Vega then walked back to Mr. Cardona, asked him again to "hold on for me," and walked across the road to speak with Defendant Drey.

59.     Mr. Cardona remained standing by himself without handcuffs while Defendant Vega crossed the road to speak with Defendant Drey.

## II.     Defendants Acknowledged On-Scene That Mr. Cardona Successfully Completed the SFSTs and That They Planned to Release Him.

60.     The "decision points" for the HGN test, Walk and Turn test, and One Leg Stand test are four clues, two clues, and two clues, respectively.[12]

61.     The HGN test is "the most reliable field sobriety test."[13]

62.     Defendant Vega informed Defendant Drey of the following:

a.     "He's good."

b.     "I only got two clues on the H[orizontal] G[aze] N[ystagmus] . . . . He just had the lack of smooth pursuit."

---

[11] NHTSA Instructor Guide, *supra*, at 298.
[12] Ex. 1 at 2-3.
[13] NHTSA Instructor Guide, *supra*, at 300.

    c.   "He had good balance and stuff like that. I had worse balance on the One Leg Stand."

63.    Defendant Vega contrasted Mr. Cardona's balance and positive performance on the One Leg Stand test with his own failed attempt to demonstrate the test for even a few seconds before he needed to put a foot down to regain his balance.

64.    In response to Defendant Vega's conclusion that Mr. Cardona was "good," Defendant Drey agreed, stating, "I figured . . . ." In explaining why he "figured" that Defendant Vega would form that conclusion, Defendant Drey noted that before the DWI unit arrived, Mr. Cardona was able to stand with his feet together for a long time and that "he seemed pretty clear-eyed and everything." At the end of the conversation, Defendant Drey stated, "good to know" and Defendant Vega replied, "no problem."

65.    Other than the two clues on the HGN–merely half of the number of clues required by the test's own terms to permit an inference of intoxication–Defendant Vega did not identify any clues or other indications of intoxication or impairment. In fact, Defendant Vega even specified, "He just had the lack of smooth pursuit," which, accounting for each eye, constitutes a total of two clues.

66.    After finishing the conversation with Defendant Drey, Defendant Vega removed Mr. Cardona's driver's license from his pocket, returned it to Defendant Drey, and crossed back across the road to where Defendant Ferguson was speaking to Mr. Cardona.

67.    Defendant Ferguson told Mr. Cardona, "You are going to be going home."

68.    Having witnessed and/or spoken to Defendant Vega about Mr. Cardona's successful completion of the field sobriety tests and the lack of evidence of intoxication or

impairment, all three Defendants knew that they did not have probable cause to believe that Mr. Cardona committed the offense of DWI.

### III.   Mr. Cardona Questioned Defendant Ferguson's Conduct, and Defendant Ferguson Retaliated by Spontaneously Arresting Him.

69.   While Defendant Vega was speaking to Defendant Drey across the road, Defendant Ferguson beckoned Mr. Cardona to join him several feet away.

70.   Mr. Cardona complied.

71.   Once Mr. Cardona walked over, Defendant Ferguson began pressuring Mr. Cardona to take a voluntary Preliminary Breath Test (PBT).

72.   A PBT "does <u>not</u> indicate the level of the subject's impairment."[14]

73.   In other words, "The basic purpose of PBT is to demonstrate the association of alcohol with the observable evidence of the subject's impairment. The subject's impairment is established through sensory evidence: what the officer sees, hears, and smells."[15]

74.   As explained above, Defendants—and most importantly, Defendant Vega, who conducted the investigation—had already concluded that Mr. Cardona was not intoxicated or impaired.[16]

75.   Mr. Cardona questioned the basis of Defendant Ferguson's request.

76.   As Defendant Vega walked back towards Defendant Ferguson and Mr. Cardona, Defendant Ferguson said to Defendant Vega, "He doesn't want to do it. Let's take him to jail, we'll get him a breath test."

77.   Mr. Cardona responded, "Hold on, hold on, hold on . . . "

---

[14] NHTSA Instructor Guide, *supra*, at 319.
[15] *Id.*
[16] *See* paragraphs 55, 66-68, *supra*.

78.     Defendant Ferguson became agitated and cut him off, stating, "I'm telling you. All this is—is helping him [Defendant Vega]. You are going to be going home."

79.     Mr. Cardona asked, "What's the test for?"

80.     Defendant Ferguson responded, "To see where he [Vega] is–if he's doing the right thing. That's all it is."

81.     Mr. Cardona asked whether he could make a phone call, and Defendant Ferguson responded, "No, take him to jail."

82.     As Mr. Cardona continued to request an opportunity to make a phone call and even asked to call an attorney, Defendant Vega ordered him to turn around, and Defendants Ferguson and Vega handcuffed him.

83.      When Mr. Cardona asked why they were taking him to jail, Defendant Vega told him, "You should have listened to the officer."

84.     Mr. Cardona asked Defendant Ferguson for his name and badge number, but he refused to disclose that information.

85.     All three defendants knew they did not have probable cause to arrest Mr. Cardona for DWI.

86.     As Defendants Ferguson and Vega handcuffed Mr. Cardona and placed him under arrest, Defendant Drey walked over and stood a few feet away, witnessing what was transpiring. He did not intervene to stop the retaliatory arrest.

87.     Following Mr. Cardona's arrest, Defendant Drey gave Mr. Cardona's driver's license back to Defendant Vega. Defendant Vega placed the license in a bag with Mr. Cardona's personal property.

88.     After arresting Mr. Cardona and placing him inside of a squad car, Defendants Vega, Ferguson, and Drey closed the door and briefly huddled together out of earshot of both Mr. Cardona, who was in the squad car, and Mr. Cardona's partner, who was still seated in Mr. Cardona's car.

89.     Prior to huddling, Defendants Drey and Vega appear to have turned off their individual microphones. Defendant Ferguson does not appear to have ever turned on a microphone at all. They also appear to have stood outside the range of any microphones that might have otherwise recorded their conversation. PPD's public records division has confirmed that it does not have any recordings of that conversation or any conversations that Defendants had with one another following Mr. Cardona's arrest.

90.     As Defendant Vega was booking Mr. Cardona at the station shortly after 1:30 a.m., Defendant Ferguson was standing nearby. Once Mr. Cardona was locked in a jail cell, he was unable to see or hear the conversation between Defendant Vega and Defendant Ferguson.

91.     Defendant Drey did not complete his report until 2:43:42 a.m.

92.     At the time Defendants arrested Mr. Cardona, they lacked probable cause to believe that he had committed the offense of DWI.

93.     At the time Defendants arrested Mr. Cardona, they lacked probable cause to obtain a warrant to forcibly extract and examine his blood.

**IV.   Defendants Ferguson, Vega, and Drey Deliberately Fabricated Evidence to Frame Mr. Cardona.**

    **A.   *Defendants Submitted a False Affidavit Seeking a Search Warrant to Extract and Examine Mr. Cardona's Blood.***

94.     Defendants submitted–under Defendant Vega's name–a sworn affidavit for a warrant to extract Mr. Cardona's blood. They submitted the affidavit to Judge Shari Glover of the City of Pasadena Municipal Court.

95.     Defendant Vega swore an oath that all the statements contained in the affidavit were true to the best of his knowledge.

96.     However, the affidavit hinged on multiple falsehoods that all three Defendants knew were untrue.

97.     ***HGN Falsehood:***  The affidavit states, "I . . . observed 6 clues on the Horizontal Gaze Nystagmus." The affidavit also includes a checklist repeating the false assertion that Mr. Cardona exhibited six clues on the HGN test and identifying the particular purported clues:

| Horizontal Gaze Nystagmus | | |
|---|---|---|
| Was HGN Given: | [X] Yes | [ ] No |
| **Clues** | | |
| Lack of Smooth Pursuit | [X] Left | [X] Right |
| Distinct & Sustained Nystagmus @ Maximum Deviation | [X] Left | [X] Right |
| Onset of Nystagmus prior to 45 degrees | [X] Left | [X] Right |
| Vertical Nystagmus | [ ] Yes | [X] No |
| Total HGN Clues: (Decision Point 4; Max: 6) | | 6 |
| Comments or Other Observations during HGN: | | |

98.     Defendants knew these statements were false. Before Defendant Ferguson directed Defendant Vega to arrest Mr. Cardona, Defendant Vega told Defendant Drey, "He's good. I only

got **two clues** on the H[orizontal]G[aze]N[ystagmus] . . . . He just had the lack of smooth pursuit [in each eye]."

99.     The "decision point" on the HGN test permitting an inference of intoxication or impairment is four clues.[17]

100.     Un-intoxicated and unimpaired individuals commonly exhibit a lack of smooth pursuit in each eye.

101.     At no point prior to Mr. Cardona's arrest did Defendant Vega, or any other officer on scene, claim that Mr. Cardona exhibited any more than two clues on the HGN test, or that he exhibited any clue other than "lack of smooth pursuit."

102.     ***One Leg Stand Falsehoods:*** The affidavit's (post-hoc) checklist notes two clues on the One Leg Stand: "Sways while balancing" and "Uses Arms to Balance."[18] The affidavit's narrative section claims that Defendant Vega observed "1 clue on the One Leg Stand."[19]

## AFFIDAVIT FOR SEARCH WARRANT

### One Leg Stand

| | | |
|---|---|---|
| Was One Leg Stand Given | ☒ Yes | ☐ No |

| Clues | | Comments |
|---|---|---|
| Sways while balancing | ☒ | |
| Uses Arms to Balance | ☒ | |
| Hops | ☐ | |
| Puts Foot Down | ☐ | |
| Total One Leg Stand Clues: (Decision Point 2; Max: 4) | 2 | |

Comments or Other Observations during One Leg Stand:

---

[17] *See* Ex. 1 at 2.
[18] *Id.*
[19] *Id.* at 1.

103.    Defendants knew both claims were false. Mr. Cardona never swayed while balancing or used his arms to balance such that a clue could be noted or considered evidence of intoxication. He executed the One Leg Stand test as instructed, balancing steadily on a single foot for the requisite thirty seconds, until Defendant Vega told him "you're good" and could stop.

104.    The "decision point" on the One Leg Stand test permitting an inference of impairment is two clues.[20]

105.    At no point prior to Mr. Cardona's arrest did Defendant Vega state that Mr. Cardona exhibited any clues at all on the One Leg Stand.

106.    To the contrary, Defendant Vega admitted on the scene that Mr. Cardona "had good balance and stuff like that. I had worse balance on the One Leg Stand."[21]

107.    ***Walk and Turn and Balance Falsehoods:*** The affidavit states that Defendant Vega observed "2 clues on the Walk and Turn," "noticed him to [be] unsteady on his feet," and "When Defendant spoke to Officer Drey, he found him . . . unsteady on his feet after exiting the vehicle." The affidavit also states that Defendant Vega observed Mr. Cardona's balance to be "swaying" and "unsteady," and that his walking was "swaying."

---

[20] *See* Ex. 1 at 3.
[21] Defendant Vega made the remark about his own performance because he had to put his foot down twice to balance while demonstrating the test to Mr. Cardona, whereas Mr. Cardona did not, even as he balanced for significantly longer than did Defendant Vega.

| Walk and Turn | | | | |
|---|---|---|---|---|
| Was Walk and Turn Given | | ☒ Yes | | ☐ No |
| **Clues** | | | **Comments** | |
| Cannot Keep Balance during instructions | | ☐ | | |
| Starts Too Soon | | ☐ | | |
| Steps While Walking | | ☐ | | |
| Misses Heel to Toe | | ☐ | | |
| Steps Off Line | | ☐ | | |
| Uses Arms to Balance | | ☐ | | |
| Turned Improperly | | ☒ | | |
| Wrong Number of Steps | | ☒ | | |
| Total Walk and Turn Clues: (Decision Point 2; Max: 8) | | 2 | | |
| Comments or Other Observations during Walk and Turn: | | | | |

**Balance**
☒ Swaying
☒ Unsteady
☐ Needed support
☐ Falling down
☐ Normal

**Walking**
☐ Staggering
☐ Falling
☒ Swaying
☐ Heavy Footed
☐ Normal

108.    But again, as Defendants were well aware, at no point before, during, or after the SFSTs was Mr. Cardona either swaying or unsteady. Indeed, Defendant Vega's on-scene statements confirm that Mr. Cardona, in Defendant Vega's words, "had good balance and stuff like that." As Defendant Vega remarked, "I had worse balance on the One Leg Stand."

109.    Moreover, while on scene, Defendant Drey told Defendant Vega that although he thought at one point he might have detected a sway prior to Defendant Vega's arrival, he then observed Mr. Cardona standing, as instructed, with his feet together for a long time without a problem.

110.    At no point prior to Mr. Cardona's arrest did Defendant Vega state that Mr. Cardona's performance on the Walk and Turn test gave any indication that he was intoxicated or

impaired. Although Mr. Cardona turned using a swivel instead of a "small series of steps" as originally instructed, even counting that as a clue would amount to a total of one clue, below the test's two-clue "decision point." He did not take an incorrect number of steps such that a clue could be noted or considered evidence of intoxication.

111.    During the Walk and Turn, as with all of the other SFSTs and interactions with officers on the scene, Mr. Cardona maintained his balance, remained steady, and did not sway.

112.    ***Eye Appearance Falsehoods***: The affidavit states that Defendant Vega "noticed him to have . . . red and glassy eyes," and also that "Officer Drey found him to have . . . red, glassy eyes."

113.    But Defendant Drey never made that statement to Defendant Vega on the scene. In fact, he told Defendant Vega the opposite: "He [Mr. Cardona] seems pretty clear-eyed and everything."

114.    At no point prior to Mr. Cardona's arrest did Defendant Vega–or any other officer–make any statement suggesting Mr. Cardona's eyes were anything but clear.

115.    That is because Mr. Cardona's eyes were neither red nor glassy. They were clear.

116.    ***Odor Falsehood:*** The affidavit states, "Officer Drey found [Mr. Cardona] to have a strong odor of an alcoholic beverage," and that "I came into contact with the driver and noticed him to have a strong odor of alcoholic beverage emitting from his breath and person."[22]

117.    After being pulled over, Mr. Cardona answered Defendant Drey and Vega's questions, stating that he had consumed two beers hours earlier. However, at the time he interacted with Defendants, he was not intoxicated. Nor did he emit a strong odor of an alcoholic beverage.

---

[22] *See* Ex. 1 at 1.

118.   ***Speech Falsehood***: The affidavit states, "When Defendant spoke to Officer Drey, he found him to have slurred speech." Similarly, its checklist notes that Defendant Vega noticed Mr. Cardona's speech to be "slurred."

Speech
- [X] Slurred
- [ ] Incoherent
- [ ] Thick-tongued
- [ ] Slow/Mumbled
- [ ] Normal

119.   However, at no point on the scene did any officers claim Mr. Cardona had slurred speech. That is because he did not. To the contrary, he spoke in a normal and sober manner.

120.   ***Implied Consent Falsehood.*** The affidavit states that Mr. Cardona's refusal to provide a specimen violated Texas's "Implied Consent Law."[23] However, the statute requires that the officer "hav[e] reasonable grounds to believe the person . . . while intoxicated was operating a motor vehicle. . . ."[24] As laid out above, following the SFSTs and Defendants' conclusions that Mr. Cardona was "good" and would be "going home," Defendants did not have "reasonable grounds" to believe he was intoxicated.

121.   ***Attitude Falsehood.*** The affidavit's checklist labels Mr. Cardona's attitude as "cocky."[25]

Attitude:  [ ] Cooperative   [ ] Combative   [ ] Indifferent   [X] Cocky   [ ] Apologetic   [ ] Uncooperative

122.   That is false. From the moment he was stopped until Defendant Ferguson spontaneously began pressuring him to take a voluntary breath test he was not legally required to

---

[23] *Id.* at 1.
[24] Tex. Trans. Code. § 724.012(a)(1).
[25] Ex. 1 at 3.

take and that made little sense under the circumstances, Mr. Cardona answered Defendants'
questions, consented to their field sobriety tests, and cooperated with their every instruction.

123.    *Omissions:*  In addition to the falsehoods described above, the affidavit omits
numerous material and exculpatory facts that undercut probable cause. Those omissions include:

a.  Defendant Vega observed only two clues on the HGN test—a lack of smooth
pursuit in each eye;

b.  Un-intoxicated and unimpaired individuals commonly exhibit a lack of smooth
pursuit in each eye;

c.  The decision point for the HGN test is four clues;

d.  The HGN test is "the most reliable field sobriety test";

e.  Mr. Cardona did not slur his speech;

f.  Mr. Cardona spoke in a normal and sober manner;

g.  Defendant Vega observed no clues on the One Leg Stand test;

h.  Defendant Vega observed that Mr. Cardona performed better on the One Leg
Stand test than he did;

i.  Throughout Mr. Cardona's interactions with officers that night–including
before, during and after the SFSTs–Mr. Cardona appeared balanced and steady
on his feet;

j.  Mr. Cardona did not exhibit sufficient clues on any of the SFSTs to permit an
inference of intoxication or impairment;

k.   Mr. Cardona's eyes were clear and not red or glassy;

l.  Mr. Cardona stated that he had had two beers, hours earlier;

m.  Mr. Cardona's clothing was orderly;

n.  Mr. Cardona was cooperative;

o.  After Mr. Cardona successfully completed the SFSTs, Defendants had not
observed evidence supporting a conclusion that Mr. Cardona was intoxicated
or impaired;

p. After Mr. Cardona successfully completed the SFSTs, Defendants conferred and concluded that he was not intoxicated or impaired and began the process of releasing him;

q. After Mr. Cardona successfully completed the field sobriety tests, Defendant Ferguson told him he would be going home;

r. Defendant Ferguson told Mr. Cardona the purpose of a Preliminary Breath Test would be to help assess Defendant Vega's job performance for Defendant Vega's benefit and would not affect whether or not Mr. Cardona would be released;

s. Preliminary Breath Tests do not indicate level of impairment. Rather, by detecting the presence of alcohol, they can only help identify the chemical source of an already-observed impairment;

t. Prior to pressuring Mr. Cardona to take a breath test after Defendant Vega concluded the DWI investigation, Defendant Ferguson had not participated in the investigation;

u. Defendant Ferguson made the decision to arrest Mr. Cardona after Defendant Vega—who had conducted the DWI investigation, and Defendant Drey—who had pulled over Mr. Cardona originally—concluded that Mr. Cardona should be released; and

v. As Defendants were handcuffing Mr. Cardona and he asked why he was being arrested, Defendant Vega did not say for DWI or any other offense. Rather, Defendant Vega responded, "You should have listened to the officer."

124.   Had those omitted, exculpatory statements been included, Defendants' affidavit would not have established probable cause for a search warrant to forcibly extract and examine Mr. Cardona's blood.

125.   Despite those falsehoods and omissions, Defendant Vega swore that everything contained in the affidavit was true. He then submitted the affidavit to City of Pasadena Municipal Court Judge Shari Glover as an application for a search warrant to forcibly extract and examine Mr. Cardona's blood.

126.    On information and belief, Defendant Vega prepared and submitted the false affidavit at the direction of Defendant Ferguson, and in coordination with Defendants Drey and Ferguson.

127.    Judge Glover signed the warrant.

128.    Shortly afterwards, Defendant Vega transported Mr. Cardona to HCA-Southeast Hospital, where Defendant Vega oversaw the forcible extraction of three vials of Mr. Cardona's blood, which he then submitted for examination by a government agent.[26]

### B. Defendant Vega Submitted a False Investigation Report.

129.    In addition to the false affidavit, Defendant Vega wrote and submitted, at the direction of Defendant Ferguson and in coordination with Defendants Drey and Ferguson, an investigation report largely mirroring the affidavit. It included most of the same falsehoods and omitted most of the same exculpatory information as did the affidavit described above.

130.    The report states, "On the Horizontal Gaze Nystagmus, [Mr. Cardona] had a lack of smooth pursuit in both eyes, a distinct and sustained Nystagmus at maximum deviation in both eyes, and onset of Nystagmus prior to a forty-five degree angle in both eyes. The six clues present are a high indicator of intoxication and impairment."

131.    As described in paragraphs 98 and 123 above, that is false. Defendant Vega's own on-scene statement confirms that Mr. Cardona had only two clues on the HGN test–well below the four-clue "decision point" permitting an inference of intoxication. As Defendant Vega specified on-scene, "He just had the lack of smooth pursuit."

---

[26] The toxicology report would later confirm that Mr. Cardona's blood alcohol content was below the legal limit.

132. The report states, "On the Walk and Turn, he took an incorrect number of steps and made an improper turn. The two clues present in the Walk and Turn are a high indicator of intoxication and impairment."

133. But as described in paragraphs 107 and 110-111 above, that is false. Further, Defendant Vega's own on-scene statements and actions confirm that even he recognized that Mr. Cardona did not exhibit evidence of intoxication or impairment during the Walk and Turn test.

134. The report states, "Mr. Cardona had "a strong odor of an alcoholic beverage and red glassy eyes."

135. But as described in paragraphs 40 and 112-117 above, that is false. Mr. Cardona did not have a strong odor of an alcoholic beverage. And, as Officer Drey acknowledged in his on-scene statement to Defendant Vega, Mr. Cardona did not have red or glassy eyes. Rather, he was "clear-eyed."

136. The report states, "On the One Leg Stand, he used arms for balance, showing one clue."

137. But as described in paragraphs 62, 102-106, and 123 above, that is false. And Defendant Vega's on-scene statements confirm that Mr. Cardona "had good balance" and did not exhibit any clues on the One Leg Stand. As Defendant Vega put it in his on-scene statement to Defendant Drey, "I had worse balance on the One Leg Stand."

138. Defendant Vega's report also omits the same exculpatory statements as those in the affidavit described above in paragraph 123.

139. On information and belief, Defendant Vega wrote the report, at Defendant Ferguson's direction and in coordination with Defendants Drey and Ferguson, to corroborate his affidavit and wrongfully incriminate Mr. Cardona.

### C. Defendant Drey Submitted a Misleading Supplemental Report.

140.    Defendant Drey also submitted a misleading "supplemental report" following Mr. Cardona's arrest.

141.    Defendant Drey's report contained falsehoods similar to those in Defendant Vega's report.

142.    Defendant Drey's report stated that Mr. Cardona had "watery eyes" and "the strong odor of an alcoholic beverage about his breath."

143.    But as Defendant Drey acknowledged in a conversation with Defendant Vega, Mr. Cardona was "pretty clear-eyed and everything." And, as explained in paragraphs 39-40 and 112-117 above, Mr. Cardona did not have watery eyes or a strong odor of alcohol.

144.    Defendant Drey's report stated, "I observed [Mr. Cardona] to have a slight sway as he stood," without any clarification or qualification.

145.    But as Defendant Drey himself conceded in an on-scene statement that he omitted from his report, although he claimed he thought he detected a sway when Mr. Cardona first exited his car, Defendant Drey watched Mr. Cardona standing with his feet together "for a long time" without a problem. And in response to Defendant Vega's statement that Mr. Cardona was "good" and "only got two clues on the HGN," Defendant Drey stated, "I figured."

146.    On information and belief, Defendant Drey submitted the supplemental report at the direction of Defendant Ferguson, and in coordination with Defendants Ferguson and Vega, for the purposes of concealing their unjustified arrest of Mr. Cardona and further retaliating against Mr. Cardona for questioning Defendant Ferguson's conduct.

### D. Defendant Vega Lied to the Harris County District Attorney's Office to Mislead It into Prosecuting Mr. Cardona.

147.    In addition to creating false evidence in the forms of the aforementioned police paperwork and affidavit, Defendant Vega lied to the Harris County District Attorney's Office (HCDAO).

148.    After arresting Mr. Cardona, submitting the fabricated affidavit for a blood extraction warrant, and forcibly extracting Mr. Cardona's blood, Defendant Vega contacted the Assistant District Attorney responsible for screening arrests and deciding whether to initiate prosecutions.

149.    On information and belief, Defendant Vega told her the same false statements, and omitted the same exculpatory facts, as he did in the affidavit for a blood extraction warrant and his investigation report.[27]

150.    On information and belief, Mr. Cardona did so at the direction of Defendant Ferguson, and in coordination with Defendants Drey and Ferguson.

151.    Based on Defendant Vega's false account, HCDAO agreed to accept the case and prosecute Mr. Cardona in Harris County District Court for the offense of felony DWI.

152.    Mr. Cardona remained in police custody and jail from approximately 1:00am on Sunday, February 9, to approximately 7:30am on Monday, February 10.

### E. Defendant Vega Submitted a (Second) False Affidavit to Mislead the Court into Finding Probable Cause for the Charged Offense, Imposing Onerous Conditions of Pretrial Release, and Delaying Dismissal of the Unsupported Charge.

153.    In Harris County, after a person is arrested, their case is presented to a magistrate known as a Criminal Law Hearing Officer. That magistrate assesses whether a sworn affidavit submitted by an officer establishes probable cause for the charged offense. If the magistrate finds

---

[27] See Section IV(A), supra.

probable cause, they then consider the allegations in the affidavit along with other factors to decide whether to order detention or impose conditions of release.

154.    After HCDAO determined that it would prosecute Mr. Cardona, his case was scheduled for a probable cause review by a magistrate.

155.    The affidavit reviewed by the magistrate in Mr. Cardona's case was sworn to and submitted by Defendant Vega. Defendant Vega submitted that affidavit under penalty of perjury via the District Attorney Intake Management System (DIMS), knowing that a prosecutor and magistrate would rely on it for purposes of assessing probable cause and making a decision about detention and/or conditions of release. He also did so knowing that, at some point, a defense attorney would rely on it to make arguments about detention and/or conditions of release.

156.    This second sworn statement by Defendant Vega repeated the statements he and the other Defendants knew were false and omitted the exculpatory statements they knew were true, mirroring the affidavit for a blood extraction warrant that he previously submitted to Judge Glover and the report he had submitted. It was also consistent with the report submitted by Defendant Drey.

157.    Specifically, he repeated the following facts that, as already explained in Section IV(A), are false:

      a.  Defendant Vega "observed 6 clues on the Horizontal Gaze Nystagmus, 2 clues on the Walk and Turn, and 1 clue on the One Leg Stand";

      b.  Defendant Vega "Noticed him to have . . . red and glassy eyes";

      c.  Defendant Vega "noticed him . . . unsteady on his feet";

      d.  Defendant Vega "noticed him to have a strong odor of alcoholic beverage emitting from his breath and person";

      e.  Defendant Drey "found him to have  . . . Red, Glassy Eyes";

    f.   Defendant Drey "found him to have slurred speech";

    g.   Defendant Drey "found him to have a strong odor of an alcoholic beverage"; and

    h.   Defendant Drey "found him . . . unsteady on his feet . . . ."

158.    In addition to those falsehoods, the affidavit that Defendant Vega submitted for review by the magistrate omitted the same exculpatory facts as did his prior affidavit for a search warrant, described above in sections IV(A) and IV(B).

159.    But for the inclusion of those falsehoods and omission of those exculpatory facts, Defendant Vega's sworn affidavit would not have supported a finding of probable cause for the offense of DWI.

160.    On information and belief, Defendant Vega prepared and submitted this second false affidavit at the direction of Defendant Ferguson, and in coordination with Defendants Drey and Ferguson.

161.    Defendants' false, written statements (excluding Defendant Vega's verbal statement to the screening prosecutor) in their various forms are summarized on the following page:

**SUMMARY OF DEFENDANT VEGA AND DREY'S WRITTEN STATEMENTS**

| | On-Scene (Verbal) Statements | Blood Extraction Affidavit (Vega) | Investigation Report (Vega) | Prosecution/ Magistrate Affidavit (Vega) | Supplemental Report (Drey) |
|---|---|---|---|---|---|
| **HGN Clues** | **2**<br><br>Vega: *"I only got 2 clues on the HGN."* | 6 | 6 | 6 | -- |
| **One Leg Stand Clues** | **None noted**<br><br>Vega: *"[Mr. Cardona] had good balance and stuff like that. I had worse balance [than he did] on the One Leg Stand."* | 2[28]<br><br>"Sways while balancing" and<br><br>"Uses Arms to Balance" | 1<br><br>"used arms for balance" | 1 | -- |
| **Walk and Turn Clues** | **None noted**<br><br>Vega: *"[Mr. Cardona] had good balance and stuff like that."* | 2 | 2 | 2 | -- |
| **Balance** | **"good balance"**<br><br>Vega: *"[Mr. Cardona] had good balance and stuff like that. I had worse balance [than he did] on the One Leg Stand."*<br><br>Drey: *"I figured. . . . I had him standing here for a minute. I thought he had a sway, but meanwhile I had him standing here with his feet together and he stood like that for a long time."* | "Swaying" and "unsteady" | -- | "Unsteady on his feet" | "I observed him to have a slight sway as he stood" |
| **Eyes** | **"pretty clear-eyed"**<br><br>Drey: *"[Mr. Cardona] seems pretty clear-eyed and everything."* | "red and glassy eyes," and<br><br>"Officer Drey found him to have . . . red, glassy eyes." | -- | "red and glassy eyes," and<br><br>"Officer Drey found him to have . . . red, glassy eyes." | "watery eyes" |
| **Overall Conclusions About Intoxication** | **"He's good."**<br><br>Vega: *"He's good. . . ."*<br><br>Drey: *"I figured. . . ."*<br><br>Ferguson: *"You are going to be going home."* | "I believe that the suspect is intoxicated . . . and that the suspect lost the normal use of his/her mental or physical faculties . . . ." | "I believe that Cardona was intoxicated . . . and that Cardona had lost the normal use of his mental and/or physical faculties . . . ." | -- | -- |

---

[28] Unlike the checklist contained in the sworn affidavit, which incorrectly lists two clues, the narrative portion notes, also incorrectly, "1 clue on the One Leg Stand." *See* paragraph 102, *supra*.

162.     Had Defendant Vega submitted an affidavit that excluded the falsehoods and included the exculpatory information, the Harris County District Attorney's Office would not have proceeded with the prosecution. And even if it had, the magistrate would have found no probable cause.

163.     However, rather than review a truthful and complete affidavit, the magistrate reviewed a false and misleading one prepared by Defendant Vega, at Defendant Ferguson's direction, in coordination with Defendants Ferguson and Drey.

164.     The magistrate's review of Defendant Vega's sworn statement occurred *ex parte*, without either Mr. Cardona or a defense attorney present.

165.     As a result of Defendants' deliberate inclusion of falsehoods and omission of exculpatory information, the magistrate found the existence of probable cause for the charged felony offense.

166.     As a result of Defendants' deliberate inclusion of falsehoods and omission of exculpatory information, the magistrate imposed a series of intrusive and burdensome obligations by which Mr. Cardona was required to abide as conditions of release during the pendency of his case:

    a.  Mr. Cardona was ordered to submit to supervision by Harris County Pretrial Services;

    b.  Mr. Cardona was ordered to report to Harris County Pretrial Services in person;

    c.  Every morning during the four months that the case was pending, Mr. Cardona was required to log onto a website to see whether he would be required to appear in person for a random drug test that day, regardless of his work schedule or previous commitments he may have planned;

    d.  Mr. Cardona was prohibited from using or even possessing any products that contained alcohol, including food, mouthwash, disinfectant wipes, aftershave, cough syrup, and many other typical household products;

e. Mr. Cardona was required to have his breath analyzed by a machine three times a day, on every day of the week. He had to do so during each of three inflexible time windows: 5:00 a.m. to 8:00 a.m. (test one), 5:00 p.m. to 8:00 p.m. (test two) and 10:00pm to midnight (test three). He had to pay for the machine himself. He would have to interrupt whatever he was doing–working, exercising, hanging out with friends or, as was often the case after a grueling 12-hour shift at the refinery, sleeping–to blow into the machine. Although technically portable, the machine was heavy, unwieldy, humiliating, and unsuitable for use inside the chemical plant and refinery.

167.    But for Defendants' inclusion of falsehoods and omission of exculpatory facts in the affidavit submitted to the magistrate, the magistrate would not have imposed such restrictive and burdensome conditions of release.

168.    Those conditions remained in force for the four months that the felony prosecution remained pending.

**V.    Mr. Cardona's Case Was Dismissed and His Disciplinary Complaint Was Sustained.**

169.    On June 8, 2020, while the criminal case against him was still pending, Mr. Cardona filed a disciplinary complaint with PPD's Internal Affairs Division (IAD).

170.    The next day, the HCDAO dismissed the criminal case against him.

171.    After conducting a "formal investigation" into Mr. Cardona's complaint, IAD concluded, "The evidence assembled during the investigation was sufficient to prove the allegation made in your complaint . . . ."

172.    The PPD Chief of Police signed a letter to Mr. Cardona stating that his complaint had been sustained.

 **CITY OF PASADENA**
**POLICE DEPARTMENT** 

October 19, 2020

David Cardona



Re:  Complaint Control #1321

Dear Mr. Cardona:

A formal investigation has been conducted by this department concerning the complaint received from you. The evidence assembled during the investigation was sufficient to prove the allegation made in your complaint, and appropriate action will be taken. We thank you for bringing this matter to our attention.

Sincerely,

Chief of Police

#0628

Internal Affairs Division

173.    PPD has refused to disclose what, if any, disciplinary action has been taken against Mark Ferguson, Elias Vega, or Damon Drey, citing the Civil Service rules.

174.    As of February 1, 2022, all three defendants remain employed by PPD.

**VI.   Defendants' Framing of Mr. Cardona Caused Him Serious Trauma and Harm.**

175.    Although the case against Mr. Cardona was ultimately dismissed and his IAD complaint was sustained, this is not an example of the criminal system "working." To the contrary, this case underscores the irreversible harm police can inflict when they abuse the unparalleled trust and power with which the system endows them.

176.    Dismissal of Mr. Cardona's case, which was filed only because three police officers agreed to lie, did not undo the harm that those officers caused.

33

177.    Dismissal did not reverse the humiliation and fear that Defendants inflicted upon Mr. Cardona and his partner by arresting him in front of her and transforming their date night into a nightmare.

178.    Dismissal did not return the three vials of his blood that were forcibly extracted and examined by a government agent through the fraudulently-obtained, coercive power of the court.

179.    Dismissal did not wash away the trauma of two nights in jail–where Mr. Cardona was left to sleep on a cold, concrete slab with nothing but toilet paper for a pillow, in a cell full of strangers, with a single, door-less public toilet, surrounded by people who were in the midst of crises of their own–rather than safe in his own bed, in his own home.

180.    Dismissal did not dissipate the memory of having to press the "emergency" button and call for jail guards because one of his cellmates began convulsing, suffered a seizure, and lay unconscious and bleeding on the floor in front of him.

181.    Dismissal did not reimburse him for the thousands of dollars he paid to a defense attorney that he could have used instead for rent, groceries, and saving to support his growing family. Or for the income he lost due to work missed for court obligations. Or for the hundreds of dollars he was required to pay to a private company to monitor the daily contents of his breath.

182.    Dismissal did not retroactively ease the embarrassing and disruptive requirement of having to plan every day around the three mandatory "blows" into a breath analysis machine.

183.    Dismissal did not reverse the destabilizing fear and anxiety he suffered while his felony case was pending, knowing that he was facing up to a decade in prison and that, at any moment, if the Judge decided he had violated any one of the many onerous conditions of release that had been imposed, he could be returned to the jail and lose access to his family, job, and freedom.

184.    Dismissal did not enable him to recoup the workdays interrupted, and days spent dealing with court obligations.

185.    Dismissal did not eliminate the shame and everyday implications of having his name tied to a felony charge on every background check.

186.    Dismissal did not allay the anxiety he now feels whenever he drives a car, or the nearly debilitating dread that fills his stomach whenever he notices a police cruiser in his rearview mirror.

187.    And dismissal did not remedy the disillusionment, pain, and sense of betrayal that comes from having one's rights violated by those who purportedly exist to protect them.

188.    By their actions, Defendants caused Mr. Cardona emotional distress, fear, embarrassment, humiliation, reputational damage, inconvenience, loss of income, and physical pain.

189.    As such, Mr. Cardona makes the following claims and seeks the following relief.

**CLAIMS FOR RELIEF**

**COUNT I:**
**Deliberately Fabricating False Evidence to Frame Mr. Cardona in Violation of the**
**Fourteenth Amendment's Due Process Clause**
**42 U.S.C. § 1983**

*Against All Defendants*

190.    Mr. Cardona re-alleges and incorporates by reference the allegations set forth in paragraphs 1-189 above as if fully set forth herein.

191.    As the Fifth Circuit has proclaimed,

Deliberate framing of a person by the state offends the most strongly held values of our nation. We echo again the apt words of the First Circuit that, "if any concept is fundamental to our American system of justice, it is that those charged with upholding the law are prohibited from deliberately fabricating evidence and framing individuals." As the Third Circuit has stated, "no sensible concept of

ordered liberty is consistent with law enforcement cooking up its own evidence." .
. . . The rule of law, which we have cherished since our founding, cannot abide such
conduct.

*Cole v. Carson*, 802 F.3d 752, 772 (5th Cir. 2015), *cert. granted, judgment vacated sub nom.*

*Hunter v. Cole*, 137 S. Ct. 497 (2016), and *opinion reinstated in relevant part,* 905 F.3d 334 (5th

Cir. 2018).

192.    Here, Defendant Vega, at Defendant Ferguson's direction and in coordination with

Defendants Ferguson and Drey, wrote and submitted a sworn affidavit containing statements they

knew to be false, and omitting exculpatory statements they knew to be true. They did so to mislead

Judge Shari Glover of the City of Pasadena Municipal Court into authorizing a warrant to extract

and examine Mr. Cardona's blood, which she did.

193.    Defendant Vega, at Defendant Ferguson's direction and in coordination with

Defendants Ferguson and Drey, provided a statement containing the same falsehoods and

omissions, to a screening prosecutor. They did so to mislead her and HCDAO into accepting the

case and prosecuting Mr. Cardona for a felony, which they did.

194.    Defendant Vega, at Defendant Ferguson's direction and in coordination with

Defendants Ferguson and Drey, submitted a second sworn statement, containing the same

falsehoods and omissions, through the District Attorney Intake Management System to a

magistrate. They did so to mislead the magistrate into finding probable cause for the felony charge

against Mr. Cardona and imposing a number of intrusive, burdensome, and expensive restrictions

on Mr. Cardona.

195.    And Defendants fabricated multiple false police reports, containing the same

falsehoods and omissions, to conceal their misconduct, corroborate their other fabricated evidence,

and further retaliate against Mr. Cardona.

196.    In short, Defendants intentionally fabricated, caused to be fabricated, and agreed to fabricate, evidence that Mr. Cardona committed a felony.[29] In doing so, they deprived Mr. Cardona of his liberty and property without due process of law and violated Mr. Cardona's clearly established rights, including the right not to be framed by law enforcement.

197.    Defendants' deliberate fabrication of evidence that they submitted to at least one judge, one prosecutor, and one magistrate, for purposes of concealing Defendants' mistreatment of, and further retaliating against, Mr. Cardona, is so offensive to basic concepts of liberty, justice and democracy that it "shocks the conscience" and violates Mr. Cardona's clearly established Fourteenth Amendment substantive and procedural due process rights.[30]

198.    Defendants, acting under color of state law, directly and proximately caused the violations of that clearly established right and ensuing compensable injuries. Defendants' actions were willful, deliberate, and malicious, and involved reckless or callous indifference to Mr. Cardona's rights, and should be punished and deterred by an award of punitive damages against Defendants as permitted by law.

---

[29] State law does not provide a meaningful avenue for Mr. Cardona to obtain an adequate remedy. Instead, it creates a Catch-22 that effectively bars intentional tort claims against police officers. The Texas Tort Claims Act ("TTCA") immunizes police officers for intentional torts committed within the scope of their employment. *See Tipps v. McCraw*, 945 F. Supp. 2d 761, 768 (W.D. Tex. 2013) (TTCA "foreclose[s] suit against a government employee in his *individual* capacity if he was acting within the scope of employment. . . .") (emphasis in original). However, Texas has not waived sovereign immunity as to intentional torts, so he cannot sue the City, either. *See Franka v. Velasquez*, 332 S.W.3d 367, 378 (Tex. 2011) (TTCA "expressly excluded intentional torts from the scope of the Act's [sovereign] immunity waiver.").

[30] Some courts have referred to a due process violation based upon fabricated evidence leading to a deprivation of liberty as a "fabrication-of-evidence" or "fair trial" claim. *See, e.g.*, *Morgan v. Chapman*, 969 F.3d 238, 250 (5th Cir. 2020) (noting the court's reinstatement of "three fabrication-of-evidence claims."); *Frost v. New York City Police Dep't*, 980 F.3d 231, 249-50 (2d Cir. 2020) ("Notwithstanding the nomenclature, a criminal defendant's right to a fair trial protects more than the fairness of the trial itself. Indeed, a criminal defendant can bring a fair trial claim even when no trial occurs at all. . . .[T]he (perhaps imprecisely named) fair trial right protects against deprivation of liberty that results when a police officer fabricates and forwards evidence to a prosecutor that would be likely to influence a jury's decision, *were that evidence presented to the jury*.") (internal quotations and citations omitted).

**COUNT II:**
**Reliance on False Statements and Material Omissions in an Application for a Warrant to Forcibly Extract and Examine Mr. Cardona's Blood in Violation of the Fourth Amendment**
**42 U.S.C. § 1983**

*Against All Defendants*

199.    Mr. Cardona re-alleges and incorporates by reference the allegations set forth in paragraphs 1-198 above as if fully set forth herein.

200.    Defendant Vega's submission to a City of Pasadena judge, of the sworn application for a warrant to forcibly extract and examine Mr. Cardona's blood, at Defendant Ferguson's direction and in coordination with Defendants Ferguson and Drey, violated Mr. Cardona's clearly established Fourth Amendment rights.

201.    The warrant for Mr. Cardona's forcible blood extraction and examination would not have been issued, and Mr. Cardona's blood would not have been forcibly extracted and examined by a government agent, but for Defendants' false statements and material omissions.

202.    Defendants included, caused to be included and agreed to include these false statements and material omissions in their warrant application knowingly and intentionally, or with reckless disregard for the truth.

203.    On information and belief, all three Defendants assisted in the preparation of the false affidavit by agreeing upon falsehoods to include and exculpatory facts to omit. They did so either while huddling on-scene with their microphones turned off or shortly afterwards while at least Defendants Ferguson and Dray were together at the station, but before producing the false statements appearing to conceal and justify Defendant Ferguson's directive to arrest Mr. Cardona.

204.    Defendants' unconstitutional acts, under color of state law, directly and proximately caused compensable injury to Mr. Cardona.

205.    Defendants' actions were willful, deliberate, and malicious, and involved reckless or callous indifference to Mr. Cardona's rights, and should be punished and deterred by an award of punitive damages against Defendants as permitted by law.

### COUNT III:
### Reliance on False Statements and Material Omissions in an Affidavit in Support of Probable Cause for a Felony Prosecution in Violation of the Fourth Amendment 42 U.S.C. § 1983

*Against all Defendants*

206.    Mr. Cardona re-alleges and incorporates by reference the allegations set forth in paragraphs 1-205 above as if fully set forth herein.

207.    Defendants' reliance on false statements and material omissions in an affidavit, submitted to a magistrate for review of whether probable cause existed for a felony prosecution and its associated searches and seizures, violated Mr. Cardona's clearly established Fourth Amendment rights.

208.    But for Defendants' false statements and material omissions, the magistrate would not have found probable cause for the felony prosecution to proceed. Nor would she have compelled Mr. Cardona to submit to the numerous searches and seizures arising from the pending felony case, including three daily breath tests, random drug testing, required appearances at court and pretrial services, and other searches and seizures.

209.    Defendants' unconstitutional acts, under color of state law, directly and proximately caused compensable injury to Mr. Cardona.

210.    Defendants included, caused to be included, and agreed to include these false statements and material omissions in the affidavit knowingly and intentionally, or with reckless disregard for the truth.

211.    On information and belief, all three Defendants assisted in the preparation of the false affidavit by agreeing upon falsehoods to include and exculpatory facts to omit. They did so either while huddling on-scene with their microphones turned off or shortly afterwards while at least Defendants Ferguson and Dray were together at the station, but before producing the false statements appearing to conceal and justify Defendant Ferguson's directive to arrest Mr. Cardona.

212.    Defendants' actions were willful, deliberate, and malicious, and involved reckless or callous indifference to Mr. Cardona's rights, and should be punished and deterred by an award of punitive damages against Defendants as permitted by law.

**COUNT IV:**
**Retaliation for Mr. Cardona's Questioning the Legitimacy of—and His Legal Obligation to Agree to—Defendant Ferguson's Urging That He Take a Voluntary Breath Test in Violation of the First Amendment**
**42 U.S.C. § 1983**

*Against all Defendants*

213.    Mr. Cardona re-alleges and incorporates by reference the allegations set forth in paragraphs 1-212 above as if fully set forth herein.

214.    The First Amendment prohibits government officials from retaliating against individuals engaged in constitutionally protected activities.

215.    Mr. Cardona engaged in constitutionally protected speech when he questioned the legitimacy of–and his legal obligation to agree to–Defendant Ferguson's urging that he take a voluntary breath test for the purported reason of "help[ing]" Defendant Vega.[31]

216.    As established above, there was no probable cause to arrest Mr. Cardona for the offense of DWI.

---

[31] *See* paragraphs 69-84, *supra.*

217.    Defendants would not have arrested Mr. Cardona but for his questioning of Defendant Ferguson's conduct and the legal basis of his request.[32]

218.    By arresting Mr. Cardona and deliberately fabricating evidence, deliberately causing evidence to be fabricated, and deliberately agreeing to fabricate evidence against him because of his speech, Defendants impermissibly retaliated against him in violation of his clearly established First Amendment rights.

219.    But for Mr. Cardona's engagement in constitutionally protected activity, Defendants would not have arrested and fabricated false evidence to incriminate him.

220.    Defendants' unconstitutional acts, under color of state law, directly and proximately caused compensable injury to Mr. Cardona.

221.    Defendants' actions were willful, deliberate, and malicious, and involved reckless or callous indifference to Mr. Cardona's rights, and should be punished and deterred by an award of punitive damages against Defendants as permitted by law.

**COUNT V:**
**Civil Conspiracy**
**42 U.S.C. § 1983**

*Against all Defendants*

222.     Mr. Cardona re-alleges and incorporates by reference the allegations set forth in paragraphs 1-221 above as if fully set forth herein.

223.    Defendants, acting under color of state law, agreed to take actions to deprive Mr. Cardona of his clearly established constitutional rights as described in Counts I-IV.

---

[32] Even if there were probable cause that Mr. Cardona committed the traffic infraction of changing lanes without signaling, for which he was originally stopped, that infraction, like the "jaywalking" infraction discussed in *Nieves v. Bartlett*, is "endemic but rarely results in arrest." 139 S. Ct. 1715, 1727 (2019). According to a representative of PPD's Records Management Section, there were zero people arrested for changing lanes without signaling from January 1 through December 31, 2020. According to the representative, "We do not arrest for this infraction."

224.     They agreed, at Defendant Ferguson's direction, to fabricate evidence against him, in the form of false affidavits, police reports and verbal statements to HCDAO that contradicted their own observations and statements on the scene. They did so in an attempt to conceal and justify Defendant Ferguson's spontaneous and unjustified arrest of Mr. Cardona and to further retaliate against Mr. Cardona for questioning the legitimacy of, and legal basis for, Defendant Ferguson's conduct.

225.     On information and belief, Defendants formed the agreement to do so either while huddling on-scene with their microphones turned off or shortly afterwards while at least Defendants Ferguson and Dray were together at the station, but before Defendants Vega and Drey produced false the false statements.

226.     Defendants' actions were willful, deliberate, and malicious, and involved reckless or callous indifference to Mr. Cardona's rights, and should be punished and deterred by an award of punitive damages against Defendants as permitted by law.

**COUNT VI:**
**Failure to Intervene**
**42 U.S.C. § 1983**

*Against all Defendants*

227.     Mr. Cardona re-alleges and incorporates by reference the allegations set forth in paragraphs 1-226 above as if fully set forth herein.

228.     Defendants, acting under color of state law, knew or should have known that they and others were violating Mr. Cardona's constitutional rights as described in Counts I-V.

229.     Defendants each had multiple reasonable opportunities to intervene and prevent these violations but, acting with deliberate indifference, declined to do so.

230.     Defendants' failure to intervene violated Mr. Cardona's clearly established constitutional rights.

231.     Through their failure to intervene, Defendants directly and proximately caused Mr. Cardona's injuries.

232.     Defendants' actions were willful, deliberate, and malicious, and involved reckless or callous indifference to Mr. Cardona's rights, and should be punished and deterred by an award of punitive damages against Defendants as permitted by law.

### REQUEST FOR RELIEF

233.     Defendants' flagrant disregard for their professional obligations, the court system, the rule of law, and Mr. Cardona's basic dignity led to very real pain, fear, and material costs for Mr. Cardona. Mr. Cardona now asks the Court to enter a judgment confirming that these officers are not above the laws they enforce, and that they will be held accountable for abusing their authority.

234.     WHEREFORE, on the basis of the foregoing, Mr. Cardona demands a jury trial for all issues so triable pursuant to the Seventh Amendment of the United States Constitution and Federal Rules of Civil Procedure, and requests that this Court issue the following relief:

   a.   Declare that Defendants violated Mr. Cardona's constitutional rights;

   b.   Award compensatory damages against Defendants in an amount to be determined by a jury at trial;

   c.   Award punitive damages against Defendants for their willful and egregious violations of the law in an amount to be determined by a jury at trial;

   d.   Award reasonable attorneys' fees, expenses, and costs of litigation pursuant to 42 U.S.C. § 1988 and other applicable law; and

   e.   Award such other relief as the Court deems just and proper.

Respectfully submitted, this 8th day of February, 2022,


_____
Jeremy D. Cutting (*pro hac vice* forthcoming)*
Cody@civilrightscorps.org
Kiah Duggins (*pro hac vice* forthcoming)
Kiah@civilrightscorps.org
Jeffrey D. Stein (Texas Bar No. 24124197; S.D. Tex. Bar No. 3600520)**
Jeff@civilrightscorps.org
Civil Rights Corps
1601 Connecticut Ave. NW, Suite 800
Washington, DC 20009
Telephone: (202) 844-4975
*Admitted to practice in NY and GA only. Practicing under the supervision of D.C. Bar members.
**Attorney-in-Charge